UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TOMMY'S SUPPLIES LLC,           :
                                :
        Plaintiff,              :
                                :
v.                              :       CASE NO. 3:16-cv-1922(RAR)
                                :
PAPILLON INK LLC,               :
                                :
        Defendant.              :
PAPILLON INK LLC,               :
                                :
        Third-Party Plaintiff,  :
                                :
v.                              :
                                :
TOMMY RINGWALT SR.,             :
TOMMY RINGWALT JR.,             :
And CAROL LANDRY,               :
                                :
        Third-Party Defendant.  :


RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff-counterclaim defendant Tommy's Supplies LLC
("Tommy's") brings this action alleging trademark infringement,
false designation of origin, and unfair competition by Defendant
counterclaim-plaintiff, Papillon Ink LLC ("Papillon"), pursuant
to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* Tommy's, a limited
liability company with a principal place of business in Somers,
Connecticut, is engaged in the business of manufacturing,
advertising, promoting, and selling Starbrite tattoo ink. (Dkt.
#46 at 2). This case arises out of the Papillons' alleged

infringement on Tommy's mark by manufacturing, distributing, and selling tattoo ink also under the name Starbrite Ink.

After Tommy's filed the complaint, Papillon filed counterclaims and a third-party complaint against Tommy Ringwalt Sr. ("Tommy Sr."), Tommy Ringwalt Jr. ("Tommy Jr."), and Carol Landry ("Ms. Landry"). Papillon's claims against the three individuals relate to their involvement in the operation of Tommy's Supplies and the alleged misuse and misappropriation of the Starbrite mark. Papillon's complaint alleges trademark infringement by tarnishment, false designation of origin, unfair competition and breach of contract. The third-party complaint also seeks declarations regarding the ownership of the Starbrite mark.

The parties have each filed cross-motions for summary judgment. (Dkt. ##96, 101). Oral argument was held January 28, 2020. During the oral argument each party was asked pointed questions regarding its position. Based on statements and concessions made during the oral argument, as well as statements and arguments made in the briefs, the plaintiff's Motion for summary judgment is GRANTED in part and DENIED in part and the defendant's Motion for Summary Judgment is DENIED.

## I. Undisputed Facts

The following facts, drawn from the parties' Local Rule 56(a)1 and 56(a)2 statements, are undisputed and material to the claims.

Michael Nicholson ("Mr. Nicholson") and Meredith Holden ("Ms. Holden") were married from 1979 until Michael's death in 1998. (Dkt. #118, ¶ 1.).

In the 1980s, Mr. Nicholson formed and operated Papillon Tattoo Limited. (Id., ¶ 2.). The business was run out of the basement of the home of Mr. Nicholson and Ms. Holden in Enfield, CT. (Id., ¶ 3.). Tommy Sr. manufactured tattoo needles, and Mr. Nicholson allowed him to retain the proceeds from the sale of the tattoo needles. (Dkt. #114, ¶ 2).

In 1991, Tommy Sr. left Connecticut and moved to Tucson, Arizona. (Dkt. #118, ¶ 12.). While in Arizona, Tommy Sr. sold tattoo needles and supplies under the name Tommy's Supplies. (Id. ¶ 6.).

While Tommy Sr. was in Arizona, Mr. Nicholson and Carol Landry, the mother of Tommy Sr., began working for Papillon and assisting in mixing tattoo ink for Papillon Studio. (Id. ¶ 8.). Ms. Landry did not have an employment contract with Papillon Studio. (Id. ¶ 9.). Ms. Landry did not know how to mix ink prior to working at Papillon. (Dkt. #118, ¶ 41.). Ms. Landry took notes concerning the combination of pigments and other

3

ingredients used to make various colored tattoo inks. (Dkt. #114, ¶ 14.).  Ms. Landry wrote those notes in a notebook that she purchased when she began working for Papillon Studio. (Id.)

Mr. Nicholson passed away in 1998, and his widow, Ms. Holden, began running Papillon Studio. (Id. ¶ 12.)  Ms. Holden did not like the tattoo industry and did not want to the run the company. (Id. ¶ 16.)  Ms. Holden was responsible for the day-to-day operations of Papillon including ordering, shipping, ink production, and tattoo machine production. (Dkt. #118, ¶ 32.)

In late 2000 or early 2001, Ms. Holden provided Tommy Sr. and a business partner with airline tickets to return to Connecticut from Arizona. (Dkt. #114, ¶ 17, Dkt. #118 ¶ 34).

Upon his return to Connecticut in 2001, Tommy Sr. continued to make cosmetic needles, at Papillon's address in Enfield, Connecticut. (Dkt. #118, ¶ 37.)  He also began working at Papillon and was eventually named Vice President. (Dkt. #118, ¶ 35.)  Ms. Holden continued to handle the administrative aspects of the Papillon Studio business, and Tommy Sr. was in charge of marketing, attending conventions, and interacting with customers. (Dkt. #114, ¶ 18.)  Tommy Jr. also worked for Papillon Studio for approximately one year assisting Ms. Holden in the administration of the business. (Id. ¶ 19.)

Tommy's Supplies was registered with the Connecticut Secretary of the State in September 2003. (Id. ¶ 21.)

After Tommy Sr. told Ms. Holden that he could register the STARBRITE mark online, Ms. Holden told him to do so. (Id. ¶ 31.) Ms. Holden did not tell Tommy Sr. to file the STARBRITE trademark application in Papillon's name. (Id. ¶ 32.)

Tommy Sr. filed the STARBRITE trademark application on March 27, 2003. On December 4, 2003, Tommy Sr. submitted a response to an Office Action dated September 23, 2003 from the United States Patent and Trademark Office ("USPTO"). The response was on Tommy's Supplies LLC letterhead and included a specimen of the STARBRITE mark. (Id. ¶ 34.)

U.S. Trademark Registration No. 2852912 for STARBRITE was issued on June 15, 2004 in the name of Tommy Ringwalt Sr. (Id. ¶ 36.)  Ms. Holden was not surprised when she learned that the STARBRITE mark was issued to Tommy Sr. (Id. ¶ 37.)

Declarations of Use and Incontestability under Sections 8 and 15 of the Lanham Act (15 U.S.C. §§ 1058 and 1065) were filed for Registration No. 2852912 on September 10, 2010. (Id. ¶ 38.) U.S. Trademark Registration No. 2852912 was assigned from Tommy Sr. to Tommy's Supplies on December 29, 2011, as recorded by the USPTO on December 30, 2011. (Id. ¶ 39.)

A Declaration of Use and a Renewal under Sections 8 and 9 of the Lanham Action (15 U.S.C. §§ 1058 and 1059) was filed for Registration No. 2852912 on April 4, 2014 and accepted on April 19, 2014. (Id. ¶ 40.)

Tommy's Supplies owns U.S. Trademark Registration No. 4724705 for the mark STARBRITE COLORS GOES IN STAYS IN (Stylized) and Design for "tattoo inks," in Class 2, filed on November 13, 2013 and issued on April 21, 2015. (Id. ¶ 41.) Tommy's Supplies owns U.S. Application Serial No. 87185677 for the mark TOMMY'S STARBRITE COLORS (Stylized) and Design for "tattoo inks; tattooing ink; tattoo engraving ink," in Class 2, filed on September 28, 2016. (Id. ¶ 42.)

Papillon applied for the trademark STARBRITE COLORS PURE PIGMENT DISPERSION, U.S. Application Serial No. 87039378, but the application was refused as likely to cause confusion with Tommy's Supplies STARBRITE and STARBRITE COLORS GOES IN STAYS IN marks. (Id. ¶ 43.)

Tommy's Supplies also filed registrations, in 2012, for STARBRITE in numerous countries around the world, including nations in the European Union, China, Australia, Singapore, the Philippines, and Thailand. (Dkt. #118, ¶ 91.)

In the 2003-04 STARBRITE Trademark Application, Tommy Sr. initially included specimens that related to Tommy's Supplies, (a Tommy's Supplies Advertisement), but the application was rejected because the specimen was an advertisement. A second specimen was submitted once again with Tommy's labeling and was accepted. (Id. ¶ 93.)  The submission of these specimens was

accompanied by correspondence bearing Tommy's Supplies letterhead. (Id. ¶ 94.)

In 2004, Tommy's Supplies and Papillon Studio entered into an Exclusive Distributorship Agreement ("Distribution Agreement"), pursuant to which Papillon Studio granted Tommy's Supplies a nonexclusive right to purchase and distribute all products produced by Papillon Studio. (Dkt. #114, ¶ 23.) Payment under the Distribution Agreement was due upon ordering. (Id. ¶ 24.)

At the time that the 2004 STARBRITE trademark was registered, and at all times pertinent to this action, Tommy Sr. was an employee of Papillon and received a weekly check, and a W-2. (Dkt. #118, ¶ 55.)

Pursuant to the Distribution Agreement, it was understood that Tommy's Supplies was going to sell Papillon's STARBRITE ink in Europe. (Id. ¶ 64.)

Tommy Sr. began manufacturing his own ink in 2003, while still at Papillon, prior to the Distribution Agreement. (Id. ¶ 68.) Tommy Sr. left Papillon in 2005. (Id. ¶ 69.) Tommy Jr. was subsequently laid off from Papillon. (Id. ¶ 70.)

Ms. Holden later discovered that Tommy St. had begun selling tattoo ink to Dermagraphics, CAM, and Tattoo Supplies UK. (Id. ¶ 71.) Some of Papillon's customers have reported that they mistakenly bought Tommy's ink instead of Papillon's ink.

(Id. ¶ 98.)  Tommy Sr., Tommy Jr., Tommy's Supplies, its agents, servants, and/or employees never had, and do not have the STARBRITE proprietary formula developed by Papillon. (Id. ¶ 100.)

Once Tommy Sr. and Tommy Jr. ceased working at Papillon Studio, they began to operate Tommy's Supplies from a separate location. (Dkt. #114, ¶ 27.)  However, Ms. Landry continued to work for Papillon Studio mixing ink. (Id. ¶ 28.)

Ms. Landry only taught her ink recipes to two people, Aaron Oullette and David Taylor, and she only taught them a few colors. (Id. ¶ 29.)  Ms. Landry did not teach Tommy Jr. how to mix inks or the recipes she made for Papillon. (Id. ¶ 30.)

While still working at Papillon, Ms. Landry began "cleaning" at Tommy's Supplies. (Dkt. #118, ¶ 113.)  Ms. Landry was not allowed to go into the ink room at Tommy's Supplies, as Tommy Jr. did not want trade secrets revealed by either side. (Id. ¶ 114.)

Shortly after Tommy Sr. and Tommy Jr. left Papillon Studio, Ms. Holden became aware that Tommy's Supplies was selling STARBRITE Ink. (Dkt. #114, ¶ 45.)  Tommy Jr. created the formulas for the Starbrite Ink sold by Tommy's Supplies and the formulas were different than the formulas used by Papillon Supply. (Id. ¶ 46.)

Ms. Holden sold the company to Papillon, a limited liability company in which Katrina Basile is the sole member. (Id. ¶ 56.) While Ms. Basile is the owner of Papillon, her husband, Carl Basile ("Mr. Basile"), holds himself out as the manager of Papillon. (Id. ¶ 57.)

Since Mr. Basile began managing Papillon, Papillon has increased its advertising of Starbrite Ink, including advertising in the same magazines in which Tommy's Supplies advertises. (Id. at 58.) Papillon has also solicited Tommy's Supplies' distributors. (Id. ¶ 59.)

In 2016, Ms. Landry's employment with Papillon terminated. (Id. ¶ 63.) Mr. Basile has copies of Ms. Landry's notebook. (Id. ¶ 65.)

Tommy's Supplies has continuously used the STARBRITE mark for its own tattoo inks since at least as early as 2003. (Id. ¶ 68.) Since at least as early as 2005, Tommy's Supplies has spent substantial sums annually advertising its STARBRITE inks. (Id. ¶ 69.) Tommy's Supplies' STARBRITE inks have been advertised and promoted, among other places, in national tattoo industry magazines, on the internet, in internet banner ads, via the Google AdWords program, in bowling alleys across Connecticut and Massachusetts, on the radio, on a NASCAR race car, and by sponsoring events. (Id. ¶ 70.)

Since 2012, Tommy's Supplies has organized and hosted the Tommy's Tattoo Convention (the "Tommy's Convention") at the Connecticut Convention Center. (Id. ¶ 71.)  Ms. Holden attended the first Tommy's Convention in 2012. (Id. ¶ 73.)

## II.  **Legal Discussion**

### A. Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is a fact that influences the case's outcome under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  A "genuine" dispute is one that a reasonable jury could resolve in favor of the non-movant. Id.

The moving party bears the initial burden of establishing that there are no genuine disputes as to any material fact. Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Once such a showing is made, the non-movant must show that there is a genuine issue for trial.  Id.  "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture.  Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)(internal quotations and citations omitted).  A party also

may not rely on conclusory statements or unsupported allegations that the evidence in support of the motion for summary judgment is not credible. Yin Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). The party opposing summary judgment "must present specific evidence demonstrating a genuine dispute." Gannon v. UPS, 529 F. App'x 102, 103 (2d Cir. 2013) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The Court "construe[s] the evidence in the light most favorable to the non-moving party and ... draw[s] all reasonable inferences in its favor." Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2005). "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002).

**B. Claims regarding the Starbrite trademark**

It is undisputed that Tommy Ringwalt Sr. submitted an application to the U.S. Patent and Trademark Office ("USPTO") for a trademark for Starbrite Ink and that he listed himself as the owner of mark. (Dkt. #118 at ¶ 50). Since the application was granted, the parties agree that Tommy's Supplies currently holds an incontestable trademark for Starbrite Ink. (Dkt. #96-1, 9; Dkt. #115, 25). The parties also agree that under the Lanham Act "registration of a mark is considered 'prima facie

evidence of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark[.]'" <u>CSL Silicones, Inc. v. Midsun Grp. Inc.</u>, 301 F. Supp. 3d 328, 346 (D. Conn. 2018)(quoting 15 U.S.C. § 1115(a)) (alteration in original). The Lanham Act contains a number of defenses to an incontestable trademark but the only potential defense at issue in this case is that Tommy Sr. allegedly committed fraud on the USPTO when he applied for the trademark. *See* 15 U.S.C. § 1115(b)(1-9).

> Generally, a party alleging that a registration was fraudulently obtained must prove the following elements by clear and convincing evidence:
> 1. A false representation regarding a material fact.
> 2. The person making the representation knew or should have known that the representation was false ("scienter").
> 3. An intention to induce the listener to act or refrain from acting in reliance on the misrepresentation.
> 4. Reasonable reliance on the misrepresentation.
> 5. Damage proximately resulting from such reliance.

<u>Patsy's Italian Rest., Inc. v. Banas</u>, 658 F.3d 254, 270-71 (2d Cir. 2011). The party alleging "fraud must demonstrate the alleged fraud by clear and convincing evidence." <u>Orient Exp. Trading Co. v. Federated Dep't Stores, Inc.</u>, 842 F.2d 650, 653 (2d Cir. 1988)(internal quotation and citation omitted). In addition, "[t]he allegedly fraudulent statements may not be the product of mere error or inadvertence, but must indicate a 'deliberate attempt to mislead the [USPTO].'" *Id.* (quoting <u>Money Store v. Harriscorp Fin., Inc.</u>, 689 F.2d 666, 670 (7th Cir.

1982)). "To rise to the level of fraud, the false statement must be made knowingly and have been material to the PTO's decision to grant [the] trademark application." CSL Silicones, Inc. v. Midsun Grp. Inc., 301 F. Supp. 3d 328, 353 (D. Conn. 2018)(citing Haggar Int'l Corp. v. United Co. for Food Indus. Corp., 906 F. Supp. 2d 96, 127 (E.D.N.Y. 2012)). Indeed, "[f]raud in a trademark cancellation is something that must be "proved to the hilt" with little or no room for speculation or surmise; considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission; and any doubts resolved against the charging party." Yocum v. Covington, 216 U.S.P.Q. (BNA) ¶ 210 (T.T.A.B. Nov. 29, 1982).

Tommy's Supplies seeks a declaratory judgment regarding the continued use of the trademark as well as other relief against Papillon. Papillon's counterclaim and third-party claims allege, among other things, that Tommy's Supplies' trademark is invalid due to an alleged fraud on the USPTO. If the Court invalidates Tommy's trademark, Papillon seeks a declaratory judgment that Papillon is the rightful owner of the trademark. The resolution of each party's claims depends on whether Tommy Sr. acted with fraudulent intent when he filed the trademark applications in his name.

Prior to filing the trademark application, Tommy Sr. had a discussion with Meredith Holden, then owner of Papillon, and

told her he could register the Starbrite trademark online. (Dkt. #114 at ¶ 31). Even though Tommy Sr. was employed by Papillon at the time, he argues that it was reasonable for him to put the trademark application in his name because Ms. Holden allegedly told him that she was going to sell or give the business to him and instructed him to file the trademark in his name. (Tommy Sr. Dep. 65). Ms. Holden for her part states that she never promised the business to Tommy Sr. and asserts that they did not discuss whose name the application should be filed under. (Holden Dep. 57). Ms. Holden claims she did not look at the trademark application when Tommy Sr. filed it.[1] (Holden Dep. 59). She testified that she believed Tommy Sr. was registering Starbrite on Papillon's behalf. (Holden Dep. 56-57, 89). Ms. Holden also asserts that Papillon paid the trademark application fee.[2] (Holden Dep. 62).

Additionally, as part of the trademark application process, Tommy Sr. used letterhead for Tommy's Supplies LLC, as opposed to Papillon. (Dkt. #114-4, 10-11). In response to a request from the USPTO for an actual specimen of the goods displaying the Starbrite mark, Tommy Sr. submitted a graphic design of the Starbrite logo that was being used in commerce by Papillon.

---

[1] In contrast, Tommy Sr. claims that Ms. Holden completed the application alongside him. (Tommy Sr. Dep. 66-67).
[2] Tommy Sr. denies this assertion and claims he paid at least a portion of the fee. (Dkt #118 at ¶ 53).

(Dkt. #114-4, at 10-18 and ¶ 40-43).  Tommy Sr. also submitted photos of tattoo ink with Starbrite labels that were being sold by Papillon and mock-ups of print runs for those labels which were created by Papillon. (Id.). Papillon argues that this proves that Tommy Sr. intentionally defrauded the USPTO. (Dkt. #101-1 at 36).

Based on the facts, Papillon argues that the Court must conclude, as a matter of law, that Tommy Sr. acted fraudulently when he submitted the application to the USPTO.  Conversely, Tommy's Supplies argues that the Court must conclude that Tommy Sr. did not act with fraudulent intent when he filed the trademark application because, as a matter of law, Papillon's evidence is not sufficient to establish clear and convincing evidence of fraud.

"Ordinarily, the issue of fraudulent intent cannot be resolved on a motion for summary judgment, being a factual question involving the parties' state of mind." Golden Budha Corp. v. Canadian Land Co. of America, N.V., 931 F.2d 196, 201-02 (2d Cir. 1991).  As the discussion above demonstrates, there several disputed facts that must be resolved in order to determine whether Tommy Sr. acted with fraudulent intent when he submitted the trademark application.

Tommy's Supplies has provided a number of good faith explanations for its conduct. For instance, Tommy's Supplies

asserts that this was the first time Tommy Sr. had filed a trademark application, so any mistakes he made were due to his lack of familiarity with the process. (Dkt. #96-1 at 12; #117 at 18.) If a jury rejects the good faith explanations, a sufficient basis would exist for a jury to conclude that Tommy Sr. acted with fraudulent intent. By way of example, a jury could believe Ms. Holden's testimony that she did not tell Tommy Sr. that she was going to sell or give the business to him and she did not instruct Tommy Sr. to file the trademark application in his name, thereby rejecting the primary explanation that Tommy Sr. has given for registering the trademark in his name.[3]

Additionally, the fact that Tommy Sr. was an employee of Papillon and getting paid by Papillon when he submitted the application to the USPTO but chose to use Tommy's Supplies' letterhead in his correspondence could cause a jury to conclude

---

[3] If the jury does not believe Tommy Sr. on this critical fact, "the doctrine of *falsus in uno* allows that 'if [a fact finder] find[s] that a witness wilfully falsely testified to a material fact, [a fact finder is] privileged to reject all his testimony, or ... elect to ... believe part of it and accept that part of it which appealed to [a fact finder's] reason, or which was corroborated by other credible evidence and reject the rest.'" Hernandez v. NJK Contractors, Inc., No. 09-CV-4812 RER, 2015 WL 1966355, at *31 (E.D.N.Y. May 1, 2015)(*quoting United States v. Foster,* 9 F.R.D. 367, 389 (S.D.N.Y. 1949)). Therefore, if a jury concludes that Tommy Sr. is not being truthful on this critical point, the jury could rely on that fact to reject his other good faith explanations and find that he acted with fraudulent intent.

that he acted with an intent to deceive the USPTO.  That is
especially true if the jury finds that Papillon paid for the
trademark application and that Ms. Holden did not see the
application before Tommy Sr. submitted it.  Further, regardless
of the explanation provided by Tommy Sr., a jury could find that
the decision to submit specimens to the USPTO that were being
used in commerce by Papillon, demonstrates an intent to defraud.
When, as required on summary judgement, the evidence is
construed in the light most favorable to Papillon, the Court
cannot conclude, as a matter of law, that no jury could find
clear and convincing evidence that a false representation was
knowingly made to the USPTO.

Similarly, when construing the facts in the light most
favorable to Tommy's Supplies, as is required for Papillon's
cross-motion for summary judgment, the Court cannot conclude,
that Tommy Sr. acted, as a matter of law, with fraudulent
intent.  If a jury believes Tommy Sr.'s claim that Ms. Holden
specifically instructed him to register the trademark in his
name and that she filled out the application alongside him, such
that she was fully aware of the contents of the application, a
jury could conclude that Tommy Sr. did not knowingly make a
false statement to the USPTO or engage in fraudulent conduct.
Furthermore, if a jury concludes that Ms. Holden specifically
instructed Tommy Sr. to file the application in his name because

she was planning on giving the business to him, a jury would potentially find it proper for Tommy Sr. to have submitted specimens that were being used by Papillon and to claim that he was using the Starbrite mark as early as 1995, when, in fact, he was in Arizona.

As the facts make clear, there are several material issues of fact that a jury will need to resolve in order to determine whether Tommy Sr. acted with fraudulent intent by knowingly making false statements when he filed the trademark application. Thus, summary judgment is inappropriate on all of the trademark related claims.

During oral argument, both lawyers conceded that, with the exception of the claims of conversion, breach of contract and tortious interference, all of the claims and counterclaims in this case rest upon the validity of the trademark.[4]  Both lawyers

---

[4] Counts I and II each allege violations of the Lanham Act and cannot be decided until a determination has been made on the validity of the trademark.  The same is true for Count III, which alleges trademark infringement under CT common law, Count IV, which alleges a violation of the CUTPA, Count V, which asks the court to declare that Papillon's trademark is incapable of registration due to the likelihood of confusion, and Count VI, which asks the court to declare that Tommy's Supplies owns the trademark.  Counts I and II of Papillon's counterclaims seek a declaration that Tommy's fraudulently obtained the trademark and therefore the mark is incapable of registration.  Counts III, IV, V and XII are all premised, at least in part, on the notion that Tommy's fraudulently obtained the trademark and that Papillon is the real owner.

also conceded that the validity of the trademark depends on whether Tommy Sr. acted with an intent to defraud the USPTO when he applied for the trademark. Since the Court has already found that there are material issues of fact regarding the validity of the trademark and that issue permeates all claims except the claims for conversion, breach of contract, and tortious interference, summary judgment is denied for both parties, with respect to all claims contained in Tommy's Supplies complaint (Dkt. #1) and with regard to all but counts 6, 8, 10, and 11, contained in Papillon's counterclaim and third-party complaint, which will be discussed below. (Dkt. #19.)

### C. Breach of Contract

The parties entered into a distribution agreement in 2004 which granted Tommy's Supplies the right to purchase and sell Papillon's products. (Dkt #97-6; Dkt. 102-11). Papillon alleges that Tommy's Supplies breached the terms of that agreement.

In order to establish a breach of contract, the plaintiff must prove the formation of an agreement, performance by the plaintiff, breach of the agreement by the defendant and damages. Chiulli v. Zola, 97 Conn. App. 699, 706-707 (2006).

The parties seem to agree that the Distribution Agreement was in relation to sales to customers in Europe. However, the parties, disagree on what the remainder of the language in the agreement means. For its part, Papillon argues that the

Distribution Agreement permits Tommy's Supplies to sell
Starbrite products that are manufactured by Papillon and in
Papillon's packaging as opposed to selling its own version of
Starbrite.  (Dkt. #101-1, 26). However, Tommy's Supplies has a
different interpretation. (Dkt. #96-1, 15).  During the oral
argument, however, it appeared that neither party disputed the
Court's conclusion that the language of the agreement is
unclear.  "Under Connecticut law, 'the question of contract
interpretation' is generally a question of fact unless 'there is
definitive contract language' that allows the court to determine
the parties' intent as a matter of law." Chapman v. Priceline
Grp., Inc., No. 3:15-CV-1519(RNC), 2017 WL 4366716, at *4 (D.
Conn. Sept. 30, 2017)(quoting Poole v. City of Waterbury, 266
Conn. 68, 88 (2003)).  Papillon's construction of the agreement
is certainly reasonable, however, since the language of the
agreement is ambiguous, it is not appropriate for the Court to
attempt to infer the intent of the parties and thereby interpret
the agreement.

Tommy's Supplies has raised a defense regarding the statute
of limitations. (Dkt. #96-1 at 15, #117 at 21).  Specifically,
Tommy's Supplies argues that Papillon is alleging harms related
to transactions that took place well outside of the six-year
statute of limitations that is applicable to breach of contract
claims. See Conn. Gen. Stat. § 52-576 (no claims "on any

contract in writing, shall be brought but within six years after the right of action accrues[.] . . .").  Tommy's Supplies asserts the statute of limitation as both an affirmative defense and a justification for summary judgment in favor of Tommy's Supplies.

Papillon, in its brief and during oral argument, responds with an argument that, again, relates back to the issue of the underlying trademark.  In Papillon's view, the breach of the contract is the continuing sale of "knockoff ink" by Tommy's Supplies. (Dkt. #105 at 37.)  Because of the alleged continuation of the conduct, Papillon asserts that the wrong has been brought within the limitations period.

### 1. The continuing course of conduct doctrine

Courts in Connecticut "have recognized that where there is a continuing course of conduct constituting a breach of duty, the limitations period does not begin to run, or is tolled, until that conduct terminates." City of W. Haven v. Commercial Union Ins. Co., 894 F.2d 540, 545 (2d Cir. 1990)(collecting cases).

> A continuing course of conduct will toll the statute if the defendant "(1) committed an initial wrong upon the plaintiff; (2) owed a continuing duty to the plaintiff that was related to the alleged original wrong; and (3) continually breached that duty." *Flannery v. Singer Asset Fin. Co.*, 312 Conn. 286, (2014). Connecticut courts have found a continuing course of conduct where "there has been evidence of either a special relationship between the parties giving rise to

such a continuing duty or some later wrongful conduct of
a defendant related to the prior act." *Id.* Whether an
ongoing special relationship exists, and whether later
related wrongful conduct occurred, are questions of
fact.

Evanston Ins. Co. v. William Kramer & Assocs., LLC, 890 F.3d 40,

45 (2d Cir. 2018), certified question answered sub nom. Essex

Ins. Co. v. William Kramer & Assocs., LLC, 331 Conn. 493, 205

A.3d 534 (2019).

> [*B]efore* the doctrine can *be applied,* a duty must first
> be found to have existed. "The existence of a duty is a
> question of law and only if such a duty is found to exist
> does the trier of fact then determine whether the
> defendant violated that duty in the particular situation
> at hand."

Golden v. Johnson Mem'l Hosp., Inc., 66 Conn. App. 518, 526

(2001)(emphasis in original).

Papillon's brief does not specify or articulate the special

relationship which allegedly existed between the parties to

create a continuing duty. (Dkt #101-1, 42).  Papillon's brief

does not cite or discuss the relevant case law or attempt to

apply the law to the facts.  The only paragraph in the brief

that addresses the subject simply states "[t]his is a continuing

course of conduct, and therefore, Tommy's is still causing harm

to Papillon as a result."  (Id.)  The paragraph does not assert

that a special relationship exists or offer any facts to help

the court determine if a duty is owed.

As the Connecticut Supreme Court has observed,

> Our appellate courts have not defined precisely what
> constitutes a special relationship for purposes of
> tolling because the existence of such a relationship
> will depend on the circumstances that exist between the
> parties and the nature of the claim at issue. Usually,
> such a special relationship is one that is built upon a
> fiduciary or otherwise confidential foundation. A
> fiduciary or confidential relationship is characterized
> by a unique degree of trust and confidence between the
> parties, one of whom has superior knowledge, skill or
> expertise and is under a duty to represent the interests
> of the other.... The superior position of the fiduciary
> or dominant party affords him great opportunity for
> abuse of the confidence reposed in him. Fiduciaries
> appear in a variety of forms, including agents,
> partners, lawyers, directors, trustees, executors,
> receivers, bailees and guardians. The fact that one
> business person trusts another and relies on [the
> person] to perform [his obligations] does not rise to
> the level of a confidential relationship for purposes of
> establishing a fiduciary duty. [N]ot all business
> relationships implicate the duty of a fiduciary.... In
> the cases in which this court has, as a matter of law,
> refused to recognize a fiduciary relationship, the
> parties were either dealing at arm's length, thereby
> lacking a relationship of dominance and dependence, or
> the parties were not engaged in a relationship of special
> trust and confidence. Accordingly, a mere contractual
> relationship does not create a fiduciary or confidential
> relationship.

Saint Bernard Sch. of Montville, Inc. v. Bank of Am., 312 Conn.

811, 835 (2014)(alterations in original)(internal quotation

marks and citations omitted).

In this case, Papillon has not alleged that a fiduciary

relationship exists and has not offered any facts to establish

that a fiduciary relationship exists. As the Connecticut Supreme

Court noted in Saint Bernard, *supra*, the superior position of

the fiduciary or dominant party affords the fiduciary or

dominant party the opportunity to abuse the confidence that has been reposed in him. If a fiduciary duty existed or if there was a dominant party in this business relationship, it would have been Papillon or Ms. Holden. Papillon alleges that Ms. Holden was the sole owner of Papillon, Ink when the parties entered into the Distribution Agreement in 2004. (Dkt. #112-1, ¶ 31 and ¶ 33). Additionally, it is undisputed that when the parties entered into the agreement, Tommy Sr. was an employee of Papillon, Ink and received a weekly check and W-2 from Papillon, Ink. (Dkt. #118, ¶ 55).

Even if there was a fiduciary relationship when the parties entered into the Distribution Agreement in 2004, it likely ended in 2005 when Tommy Sr. left Papillon.[5] (Dkt. #118, ¶ 69.) Although the contractual relationship continued to exist after Tommy Sr. left Papillon, the Connecticut Supreme Court has made clear that a mere contractual relationship does not create a

---

[5] In order for the continuing course of conduct doctrine to apply, Papillon would need to establish that Tommy Sr. owed a continuing duty to Papillon that was related to the original wrong. With respect to the breach of contract claim, the original wrong was the alleged sale of knockoff ink and refusal to pay for ink provided under the agreement. While Tommy's Supplies was obligated to honor the Distribution Agreement after Tommy Sr.'s departure from Papillon in 2005, the mere fact that the parties had a contractual relationship does not create a fiduciary or confidential relationship. See Saint Bernard, *supra*. If it did, the exception would swallow the rule as the non-breaching party would always be able to rely on the continuing course of conduct doctrine to toll the statute of limitations, as long as the contract was still in effect.

fiduciary or confidential relationship. <u>Saint Bernard</u>, 312 Conn.
at 835.

Based on the foregoing discussion, the Court finds that
Papillon has failed to establish that a duty was owed.
Therefore, the Court will not apply the continuing course of
conduct doctrine to toll the statute of limitations.

2. <u>Duress</u>

Alternatively, Papillon argues that the limitations period
should be tolled due to duress.  Although the concept of tolling
due to duress was mentioned during oral argument, Papillon's
brief devotes no time to the issue.  Papillon's brief does not
cite or discuss the relevant case law, identify the elements
that must be proven to justify tolling due to duress, or
indicate which disputed facts support each of those legal
elements.  However, the Court has sifted through the facts in
Papillon's brief and Rule 56(a) statement in order to determine
if the disputed facts create a triable issue on this matter.[6]  In

_____

[6] Although there are a handful of cases within the Second Circuit
which discuss tolling due to duress, they typically refer to
"duress tolling" as a New York doctrine. <u>Melendez v. Greiner</u>,
477 F. App'x 801, 803 (2d Cir. 2012)("based on the New York
doctrine of 'duress tolling'").  There is a dearth of case law
in Connecticut but for purposes of this motion the Court will
give Papillon the benefit of the doubt and assume that the
doctrine applies in Connecticut.  The New York cases apply
duress tolling to actions sounding in tort or negligence.
Although this is a contract claim and duress usually relates to
the validity of a contract, the Court will apply the doctrine
tolling doctrine here.

its brief, Papillon argues that there were threats to Ms. Holden's safety and her business interests if she did not acquiesce to demands made by Tommy Sr. and his business partners. (Dkt. #118 at ¶ 59.) Tommy's Supplies denies those allegations in totality. (Dkt. #118 at Response to ¶ 59.).

"'Duress' involves both threats or force by the defendant, and the submission of the plaintiff's free will to those threats. Both elements of duress must continue in order for a duress-based tort to persist as a 'continuous wrong.'" <u>Overall v. Estate of Klotz</u>, 52 F.3d 398, 404 (2d Cir. 1995). "In order to constitute a 'continuous wrong' that tolls the limitations period, *the tortious conduct itself must continue. . . .* Furthermore, the tortious conduct must continue uninterrupted." <u>Id.</u> (emphasis in original)(citing <u>Pacchiana v. Pacchiana</u>*,* 462 N.Y.S.2d 256, 257 (2d Dep't 1983)). In other words, the duration of the tolling under a duress theory is the period during which the duress continued uninterrupted.

For purposes of this motion, the Court will assume that Papillon's allegations create a question of fact as to whether duress existed from 2003 through 2005. (Dkt. #118, ¶¶ 59-66). That time period covers the date when the parties entered into the Distribution Agreement. However, there are no facts or allegations in Papillon's brief or Rule 56(a) statement that indicate that the alleged threats of force continued beyond

2005, which is when Tommy Sr. left Papillon.[7]  Thus, Papillon has failed to offer any facts that would establish that the alleged threats of force or conduct giving rise to duress continued uninterrupted after 2005.  Therefore, Papillon has not established a basis for tolling the statute of limitations for the breach of contract claim under the duress tolling doctrine.

While Papillon has not established a basis for tolling the statute of limitations, to the extent that Papillon alleges that Tommy's Supplies has breached the Distribution Agreement during the statute of limitations period, Papillon will be allowed to pursue damages for the alleged breaches that are timely.

### D. Papillon's Claim for Tortious Interference with a Business Relationship

Papillon's third party complaint includes a claim for tortious interference with business relations under Connecticut common law. In order to succeed on such a claim, Papillon must establish "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers

---

[7] Papillon has submitted a Declaration from Meredith Holden which alleges threatening behavior from 2003 through 2005. (Dkt. #116, ¶¶ 16-37). However, the Declaration fails to include detailed information or dates to create a question of fact about whether there were ongoing and uninterrupted threats after 2005.

actual loss." <u>Hi-Ho Tower, Inc. v. Com-Tronics, Inc.</u>, 255 Conn. 20, 27 (2000). To succeed Papillon needs to show "that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously." <u>Blake v. Levy</u>, 191 Conn. 257, 261, 464 A.2d 52, 54 (1983)(internal quotation omitted).

Papillon alleges that, in an effort to take business away from Papillon, Tommy's Supplies and its employees made false or incorrect statements regarding the quality of the ink produced by Papillon, the cleanliness of Papillon's studio, and Papillon's continued viability and operation. (Dkt. #19, 29-30.). During oral argument, the parties conceded that the truth or falsity of the alleged statements presents a question of fact.

For instance, Papillon alleges that employees of Tommy's Supplies allegedly made comments to suggest that smoking occurred within the facility where Papillon produces its products. Papillon admits there is smoking at the company, but denies it takes place in a location that would affect the ink being produced. (Dkt. #123, ¶ 18; Cote Dep. 47.) Another disputed statement relates to whether dogs owned by Mr. Basile and previously by Ms. Holden were supposedly running around the area where the inks are mixed, thereby potentially causing

contamination. (Dkt. #101-1, 43; Dkt. #123, ¶ 19 and ¶ 22; Cote

Dep. 48-49.) To be actionable under the tortious interference

theory the parties concede that the alleged statements would

need to be untrue.  The truth or falsity of the statements

presents a question of fact for a jury to resolve.

The tortious interference claim also requires Papillon to

produce evidence of damages. As the Connecticut Supreme Court

has stated:

> [u]nlike other torts in which liability gives rise to
> nominal damages even in the absence of proof of actual
> loss . . . it is an essential element of the tort of
> unlawful interference with business relations that the
> plaintiff suffers actual loss.  Therefore, in order to
> survive a motion for summary judgment the plaintiff must
> allege an "actual loss" resulting from the improper
> interference with her contract.  [T]he tort is not
> complete unless there has been actual damage suffered.

Appleton v. Bd. of Educ. of Town of Stonington, 254 Conn. 205,

213 (2000)(internal quotations and citations omitted).

Additionally,

> "[i]t is axiomatic . . . that in every tort action, the
> fact finder may award economic damages only if the
> plaintiff has proven those damages to a reasonable
> certainty and has shown that the defendant had
> proximately caused the damages." Thus, Plaintiff bears
> the burden of proving by a preponderance of the evidence
> that Defendants' tortious conduct proximately caused his
> alleged [damages].

Weber v. FujiFilm Med. Sys. U.S.A., Inc., No. 3:10CV401 JBA,

2013 WL 6592592, at *2 (D. Conn. Dec. 16, 2013)(quoting Jones v.

Kramer, 267 Conn. 336, 350 n. 7 (2004)).

Tommy's Supplies argues that there is no factual support for Papillon's claim that the company lost business or goodwill as a result of any of the alleged comments or conduct. (Dkt. #117, 23.)  More specifically, Tommy's Supplies cites to testimony from Mr. Basile, Papillon's current manager, and Ms. Cote, an employee of Papillon, stating that they are unsure if Papillon lost any actual customers as a result of the tortious conduct.  Mr. Basile testified that he was not sure if any of Papillon's customers stopped buying supplies from Papillon. (Basile Dep. 87). Additionally, although Ms. Cote was able to identify four customers who stopped buying supplies from Papillon, she testified that she has "no idea" why any of those customers stopped buying supplies from Papillon.[8] (Cote Dep. 52-53).

In order to survive summary judgment, Papillon must produce some evidence that, if credited by a jury, would allow a jury to conclude that the tortious conduct proximately caused actual harm to Papillon.  Conclusory statements are insufficient at this stage of the litigation. *See*, Int'l Connectors Indus., Ltd. v. Litton Sys., Inc., Winchester Elecs. Div., No. CIV.A. B-88-505(JAC), 1995 WL 253089, at *5 (D. Conn. Apr. 25, 1995)

---

[8] Citing pages 56-58 of Ms. Cote's deposition Papillon denies that "Ms. Cote did not attribute any lost customers to the actions of Tommy's Supplies." (Dkt. #114 at ¶ 66).  However, Ms. Cote's testimony at pp. 56-58 does not support the denial.

(granting summary judgement where plaintiff offered no facts to support actual loss in a claim of tortious interference); see *also* <u>Bulldog New York LLC v. Pepsico, Inc.</u>, 8 F. Supp. 3d 152, 178 (D. Conn. 2014)(AWT)(in granting summary judgment, the court found that plaintiff "has produced no evidence showing that Pepsi's conduct was the proximate cause of the harm it claims in Count 4. There is no evidence as to the purported reason why the third parties no longer wanted to work with [plaintiff].").

At this stage the Court, as in <u>Int'l Connectors</u>, finds that Papillon has provided no facts sufficient for a jury to find that they have met their burden to show actual loss as a result of the alleged tortious interference. Therefore, summary judgement is granted for Tommy's supplies as to Papillon's tortious interference claim.

### E. Papillon's Statutory Theft and Conversion Claim

Papillon included a claim for both conversion and statutory theft in its third-party complaint. "It frequently occurs that a plaintiff couples a claim for conversion with one for statutory theft, both arising out of the same set of facts." <u>Kopperl v. Bain</u>, 23 F. Supp. 3d 97, 108 (D. Conn. 2014).

> If in order to sustain a claim for statutory theft, when coupled with a claim for conversion arising out of the same facts, a plaintiff must prove "the additional element of intent *over and above* what he or she must demonstrate to prove conversion," it necessarily follows that a plaintiff who cannot prove conversion also cannot prove statutory theft.

*Id.* at 109 (citing Deming v. Nationwide Mut. Ins. Co., 279 Conn. 745, 771 (2006))(emphasis in original). Conversion requires a party to show an "unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm." Frontier Grp., Inc. v. Nw. Drafting & Design, Inc., 493 F. Supp. 2d 291, 299 (D. Conn. 2007)(citing Deming v. Nationwide Mut. Ins. Co., 279 Conn. 745, 770 (2006)). Statutory theft, while requiring the additional requirements stated above, under Connecticut General Statutes § 52-564 requires establishing that a person stole the "property of another, or knowingly receive[d] and conceal[ed] stolen property. . . ."

The entirety of the theft and conversion claims raised by Papillon relate to a notebook that was purchased by Carol Landry during her employment at Papillon. Ms. Landry purchased the notebook to keep her ink recipes in it and she kept the notebook at Papillon Ink. (Dkt. #114 at ¶ 14.) Ms. Landry asserts that after her employment was terminated, she threw out the notebook and did not provide any of the recipes to anyone at Tommy's Supplies. (Landry Dep. 132-33). Further, the current manager of Papillon has stated that Papillon is in possession of the recipes that were in the notebook. (Basile Dep. 60). The only thing of value in the notebook is therefore still in Papillon's possession.

Papillon's argument on the claims of theft and conversion can be generously described as brief. The totality of the argument rests on the claims that Mr. Landry took the notebook and thereby deprived Papillon of it. Conversely, Tommy's Supplies argues that this claim must be dismissed. Tommy's Supplies indicates that Ms. Landry purchased and used the notebook as her property. Papillon has not answered or responded to this assertion. Beyond Ms. Landry's former status as an employee of Papillon, there is no further evidence to support an argument that Papillon owned the notebook. Additionally, Ms. Landry and Papillon never had an employment agreement, thus there was no agreement addressing the ownership of the notebook. Further, it is undisputed that Mr. Basile, who manages Papillon, is in possession of the contents of the notebook. (Basile Dep. 60; Dkt. #114, ¶¶ 65 and 113). The contents of the notebook, the ink recipes, are the only items of value in this claim. Papillon does not articulate that the actual physical notebook is of any value apart from the ink recipes.

As Papillon has not shown sufficient evidence to raise a material question of fact as it relates to the ownership of the notebook, and the Court has determined that the notebook is of little or no value whatsoever, summary judgment is granted in favor of Tommy's Supplies on the claims of theft and conversion.

## CONCLUSION

Based on the foregoing reasons, the defendant's Motion for Summary Judgment is DENIED and the plaintiff's Motion for summary judgment is GRANTED in part and DENIED in part. Papillon's third-party claims alleging theft and conversion and the claims of tortious interference are dismissed. All other claims remain active and will require resolution by a jury.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States court of appeals from this judgment. See 28 U.S.C. § 636(c)(3).

SO ORDERED this 31st day of March, 2020, at Hartford, Connecticut.

_____/s/_____
Robert A. Richardson
United States Magistrate Judge